UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
JOHN DOE, by and through his   )
next friend JANE DOE, and      )
BEN BLOGGS, by and through his )
next friend JANE BLOGGS        )
                               )
              Plaintiffs,      )
                               )
         v.                    )          CIVIL ACTION
                               )          NO. 19-11384-WGY
HOPKINTON PUBLIC SCHOOLS       )
                               )
              Defendants.      )
_____)
```

YOUNG, D.J.                                September 22, 2020

**FINDINGS OF FACT, RULINGS OF
LAW, AND ORDER FOR JUDGMENT**

## I.  INTRODUCTION

This is a case about the limits of a school's ability to discipline bullying.  This is not a case about whether a school's decision to discipline two students tangentially involved in an environment of group bullying was proportional or fair, but only whether the school violated those students' First Amendment rights.  As the school did not cross this Constitutional line, its disciplinary decisions must stand.

John Doe ("Doe") and Ben Bloggs ("Bloggs") (collectively, the "Students") are high school students who allege that Hopkinton District School ("Hopkinton" or the "School") and its administrators violated their rights to free speech under state

1

and federal law.[1]

Four claims are before the Court.  In counts I and II, the Students seek declaratory and injunctive relief under 42 U.S.C. § 1983 for violations of their rights to freedom of speech and association under the First Amendment to the United States Constitution.  See Am. Compl. Declaratory & Injunctive Relief ("Am. Compl.") ¶¶ 61-72, ECF No. 19; Compl. Declaratory & Injunctive Relief ("Bloggs Compl.") ¶¶ 61-71, Bloggs v. Cavanaugh, 19-cv-11987, (Sep. 19, 2019), ECF No. 1.  In count III, the Students request a declaration that Hopkinton's anti-bullying policy and its enabling Massachusetts anti-bullying statute, Mass. Gen. L. ch. 71, §§ 37H and 37O, are unconstitutionally vague and overbroad.  See Am. Compl. ¶¶ 73-79; Bloggs Compl. ¶¶ 72-79.  The final claim, corresponding to count IV in Doe's complaint and count V in Bloggs' complaint, is for declaratory judgment under Massachusetts General Laws ch. 231A, § 1 due to the school's alleged violation of the Massachusetts law protecting students' rights to free speech in

---

[1] This Court consolidated Doe's case with that of Bloggs, Bloggs v. Cavanaugh, 19-cv-11987, on February 5, 2020.  ECF No. 55.  The complaints originally also named Carol Cavanaugh, in her individual and official capacities, and Evan Bishop, in his individual and official capacities as defendants.  Am. Compl; Bloggs Compl.  This Court dismissed the claims against Cavanaugh and Bishop, leaving Hopkinton as the sole defendant.  See Electronic Clerk's Notes, Bloggs, 10-cv-11987 (D. Mass. Jan. 13, 2019), ECF No. 25.

school, Mass. Gen. Laws ch. 71, § 82.  See Am. Compl. ¶¶ 80-84;
Bloggs Compl. ¶¶ 84-88.

The Students and Hopkinton have cross-moved for summary
judgment.  ECF Nos. 64, 69.  Hopkinton has filed an answer to
the Students' complaints, ECF No. 56, and the parties have fully
briefed the issues for summary judgment.  See Pls.' Mem. Supp.
Mot. Sum. J. ("Pls.' Mem."), ECF No. 73; Def.'s Mem. Supp. Sum.
J. ("Def.'s Mem."), ECF No. 74; Def.'s Opp'n Mot. Sum. J.
("Def.'s Opp'n"), ECF. No. 81; Pls.' Opp'n Mot. Sum. J. ("Pls.'
Opp'n"), ECF No. 82; Pls.' Reply Resp. Mot. Sum. J. ("Pls.'
Reply"), ECF No. 84.  Both parties have submitted statements of
material fact, as well as responses to each others' statements.
See Pls.' Joint Statement Material Fact L.R. 56.1 ("Pls.' SOF"),
ECF No. 65; Def.'s L.R. 56.1 Statement Material Fact ("Def.'s
SOF"), ECF No. 68; ECF Nos. 80, 83.  The Commonwealth of
Massachusetts submitted an amicus brief defending the
constitutionality of Massachusetts General Laws ch. 71, § 37O,
which defines bullying.  See Mem. Commonwealth Massachusetts as
Amicus Curiae Support. Def.'s Mot. Sum. J. ("Commonwealth
Amicus"), ECF No. 90.

This Court held a remote Summary Judgment hearing on June
29, 2020.  ECF No. 92.  At that hearing, the parties agreed to
proceed on a case stated basis, and this Court took all matters
under advisement.  Id.

After considering the record and the parties' arguments, this Court rules for Hopkinton on all the Students' state and federal as-applied challenges.  With respect to the Students' facial challenges to the Massachusetts bullying law, this Court rules that the Massachusetts law is neither overbroad nor vague.

## II.  FINDINGS OF FACT

### A.   The Bullying Investigation

On February 4, 2019 the father of "Robert Roe" ("Mr. Roe"), a ninth-grader at Hopkinton, filed a bullying complaint via Hopkinton's online portal alleging that another ninth-grade student, "C.G." had been bullying Roe on the bus ride home from a school hockey game.  Pls.' SOF ¶¶ 1-3.  Mr. Roe identified three other members of the hockey team as witnesses: "M.B.," "T.M.," and "B.A."  Id. ¶ 7.  Plaintiffs John Doe and Ben Bloggs, both tenth graders at the time, were also members of the hockey team but were not listed as aggressors or witnesses in the complaint.  Id. ¶ 8; Def.'s SOF ¶¶ 1-2, 4; see also Pls.' SOF, Attach. A, Bullying Prevention & Intervention Report ("Roe Report"), ECF No. 65-3.

Mr. and Mrs. Roe also sent a contemporaneous email to Hopkinton with more information about the alleged bullying.  See Pls.' SOF, Attach. E, Letter from Mr. Roe to Evan Bishop, Josh Hanna, & Justin Pominville (Feb. 4, 2019), ECF No. 65-7.  They reported that other members of the hockey team were excluding

4

Roe at team events, that C.G. was recording him without his permission, and that these recordings were circulating in a group chat.  Id.  They also noted that, while the complaint focused on C.G., they "believed that additional students may be involved from the team."  Id.  The family further asked that Roe be moved out of a class he shared with two members of the team. Id.

Two assistant principals at the School, Josh Hanna ("Hanna") and Justin Pominville ("Pominville") investigated the Roe Report allegations.  Def.'s SOF ¶¶ 7-8, 22-25.  Prior to interviewing Roe himself, Hanna spoke with M.B. and obtained his phone, Pls.' SOF ¶¶ 45-48, which gave the investigators access to a Snapchat group called "Geoff da Man" consisting of eight members: C.G (the original subject of the Roe Report), A.W, C.J., M.B., T.M, B.A., Doe and Bloggs.  Def.'s SOF ¶¶ 10, 12. Bloggs described the purpose of the group as allowing the team members to socialize, share schedules, organize social events, and send pictures and videos of themselves and others that they found funny.  Pls.' SOF, Attach. N., Deposition of Ben Bloggs ("Bloggs Dep.") 19:23-20:9, ECF No. 65-14.  Roe was not included in the group, and it was named after a tenth student "G.T." who also was not included.  Def.'s SOF ¶¶ 11-13; Pls.' SOF ¶ 54. Hanna and Pominville questioned all ten of these students (plus one other witness) in the course of their investigation.  Pls.'

SOF ¶¶ 13, 14, 65; Def.'s SOF ¶ 24.

Snapchat is a social media application that allows users to share and edit photos, videos, and messages.  Def.'s SOF ¶ 9. Its distinguishing feature compared to other social media is that any message will automatically delete itself, with group messages expiring after no more than 24 hours, unless the users take steps to save them.  See When does Snapchat delete Snaps and Chats?, Snapchat.com, https://support.snapchat.com/en-US/article/when-are-snaps-chats-deleted (last accessed June 10, 2020).

Roe informed the assistant principals that five students were involved in the alleged bullying: C.G., A.W., T.M., C.J., and B.A.  Pls.' SOF ¶ 32.  This conduct included sneaking photos and videos of him on the bus and at team spaghetti dinners, sharing photos of him on Snapchat, and whispering about him in his presence.  Id. ¶¶ 28-31; id., Attach. G, Bullying Investigation Report ("Bullying Report") P000146-147, ECF No. 65-9.  At one point, C.G. tried to get him to say "I am gay" and "dick" on camera.  Pls.' SOF ¶ 29; Bullying Report P000147.  Roe did not mention Bloggs during this interview and said that Doe was "not active in isolating" him.  Pls.' SOF ¶¶ 36-40; Bullying Report P000147.

Upon gaining access to the "Geoff da Man" Snapchat group on February 4, Hanna and Pominville were able to view and preserve

the messages that had not yet been automatically deleted.
Def.'s SOF ¶¶ 19-20; id., Attach. K, Pominville Deposition
("Pominville Dep.") 92, ECF No. 65-11; id., Attach. B, Hanna
Deposition 49, ECF No. 65-4.  On the Snapchat group were
multiple videos and pictures of Roe dating back as far as
January 19, along with pictures of other members of the team.
Pominville Dep. 104-05; Def.'s SOF, Ex. 6, Screenshots
("Snapchat Screenshots"), ECF No. 65-17.  The Snapchat
Screenshots show extremely derogatory comments by C.J., T.M. and
A.W. regarding Roe's appearance, voice, and play on the ice.
Id. at P000033-38.  For example, A.W. states -- referring to Roe
-- that "[h]is face in his gay ass helmet is so funny."  Id. at
P000038.

Doe and Bloggs both discussed Roe in the Snapchat group,
though to a lesser extent.  Bloggs asked "Was Dylan's grandma in
the third row," prompting M.B.'s response that "They tied her to
the hood," and J.C.'s reply: "With bungee cord?"  Id. at
P000034.  Bloggs then says, "Are [Roe]'s parents ugly too [o]r
did he just get bad genes," and after T.M. shares a photo of Mr.
and Mrs. Roe, Bloggs responds with "A family of absolute
beauties."  Id. at P000034-35.  In a separate conversation, Doe
says, "[A.W.] and [Roe] were made on the same day[.] [A.W.] was
the starting product and [Roe] is what it turned into kinda like
a game of telephone in 1st grade," to which Bloggs responds,

"[Roe]'s leather shampoo makes up for the looks though." Id. at P000036.  The only other message in evidence from either of them is on a thread where Bloggs identifies one of Roe's online usernames.  Id. at P000037.

Hanna and Pominville conducted all interviews for the investigation between February 4th and 6th, contacting the parents of the investigation targets on the night of February 4th.  Bullying Report PO000146.  They noted in their report that Mr. Roe had contacted the hockey coach prior to filing the Bullying Report, and in response the coach had spoken with some of the players.  Id. at PO000148.[2]  The report included summaries of interviews with each of the eight members of the Snapchat group, with Roe, and with two other members of the team who were witnesses.  Id. at PO000144.  While speaking to Hanna and Pominville, members of the team said the purpose of taking photos and videos of Roe was "for laughs" and that much of the content of the Snapchat group did not involve him.  Id. at PO000149-51.  Several members of the group stated they did not realize Roe felt excluded, but C.G. and M.B. said, respectively, that "we pick on [Roe]" and that he was "targeted."  Id. at PO000150-51.  Doe and Bloggs both told Hanna and Pominville that

---

[2] In a separate action before Judge Sorokin, the Roe family has sued the coach, Christopher MacPherson, for failing to intervene to protect Roe from bullying.  See Am. Complaint, Doe v. Macpherson, Civ. A. No. 20-cv-10025 (D. Mass, Jan. 14, 2020).

they had objected to the treatment of Roe, and both denied
posting in the chat, even though, in fact, the chat included a
record of their comments.  Id. at PO000148-49; cf. id. at
P00034-37.

Roe himself did not see these Snapchat messages until after
the investigation was complete, and never told administrators
that Bloggs or Doe were involved in the bullying.  Pls.' SOF ¶¶
36-40, 95.  Roe otherwise had no problems with Bloggs and Doe;
for example he socialized with Bloggs outside of school and they
played Xbox together.  Id. ¶¶ 35, 41, 58.  On February 4, 2019,
the day he was interviewed by the vice principals, Bloggs sent
an email to the hockey coach apologizing for his conduct towards
Roe and the negative impact on the team, and saying "I should
have taken more of a serious role in preventing anything else
from happening."  Pls.' SOF, Attach. O, Letter from Ben Bloggs
to Chris MacPherson (Feb. 4, 2019), ECF No. 65-15.

### B.   The School Bullying Policy and Investigation Results

Hopkinton has adopted an internal Bullying Prevention and
Intervention Policy and abides by a district-wide Bullying
Prevention and Intervention Plan.  See Pls.' SOF, Attach. I,
Hopkinton Bullying Prevention Policy ("Bullying Policy"), ECF
No. 65-1; id., Attach. J, Hopkinton Bullying Prevention and
Intervention Plan ("Bullying Plan"), ECF No. 65-2.  Both are
available online, and the Bullying Plan is distributed in the

Student Handbook, which must be signed each year.  Bullying Plan
000175.

Massachusetts law prohibits bullying at schools and school-
related activities.  <u>See</u> Mass. Gen. Laws. ch. 71, § 370.  The
Bullying Policy draws its definitions from Massachusetts law,
and defines "Bullying" as:

> [T]he repeated use by one or more students or school
> staff members of a written, verbal, or electronic
> expression, or a physical act or gesture, or any
> combination thereof, directed at a target that: [1]
> causes emotional or physical harm to the target or damage
> to the target's property; [2] places the target in
> reasonable fear of harm to himself or herself or of
> damage to his or her property; [3] creates a hostile
> environment at school for the target; [4] infringes on
> the rights of the target at school; or [5] materially
> and substantially disrupts the education process or the
> orderly operation of a school.

Bullying Policy 000161.  The Policy defines "Aggressor/
Perpetrator" as someone "who engages in behavior defined as
bullying, cyber-bullying, or retaliation in [Massachusetts
General Law] [chapter] 71, [section] 370."  <u>Id.</u>  Additionally,
"Cyberbullying" is defined as:

> [B]ullying through the use of technology or any
> electronic communication, which shall include, but
> shall not be limited to, any transfer or signs,
> signals, writing, images, sounds, data or intelligence
> of any nature transmitted in whole or in part by a
> wire, radio, electromagnetic, photo-electronic or
> photo-optical system, including, but not limited to,
> cell phones, electronic mail, internet communications,
> instant messages or facsimile communications.

<u>Id.</u> at 000161-62.  The Bullying Policy also notes that cyber-

bullying can "include the distribution by electronic means of a communication . . . if the distribution or posting creates any of the conditions enumerated in the definition of bullying." Id. at 000162.

Hanna and Pominville concluded, as a result of their investigation, that all eight students had engaged in "Bullying" as defined by school policy and the applicable Massachusetts law. Bullying Report PO000144, PO000151. They found that "the purpose was to make fun of [Roe]," and that such "conduct caused emotional harm to [Roe], created a hostile environment for him during school sponsored events and activities and infringed on his rights at school." Id. at P000152. Additionally, they found that:

> 4. The SnapChat group included:
>     a. Photos of [Roe] taken without his consent
>     b. Videos of [Roe] taken and posted without his consent
>     c. Photos of [Roe's] parents with disparaging comments on their appearance
>     d. Disparaging comments regarding [Roe's] appearance, voice, and anatomy
>     e. Attempts to get [Roe] to say inappropriate statements and record him doing this

Id.

This Court would note that all of these factual conclusions are well-supported in the record, except for the contention that the "purpose" of the group was to target Roe. It is more accurate to say the students used the Snapchat for many

11

purposes, and that the targeting of Roe emerged after its creation.  See Bloggs Dep. 19-20.

As a result of the bullying investigation, all eight members of "Geoff Da Man" were suspended from the hockey team for the remainder of the 2018-2019 season.  Def.'s SOF ¶ 51. School Principal Evan Bishop held individualized suspension hearings for the eight students in February of 2019, issuing Doe a three-day suspension and Bloggs a five-day suspension.  Id. ¶¶ 42-49.  The other students received suspensions of one to five days.  Id. ¶ 50.  Later that year, Bloggs lost his position in the National Honor Society as a result of his disciplinary record.  Pls.' SOF, Attach. AA, Letter from Ben Bloggs to National Honor Society (Sep. 22, 2019), ECF No. 65-27.

After the investigation Roe received support from the school's Student Therapeutic Academy Resource Team (START), declined to try out for another sports team in the spring, and entered formal mental health treatment.  Def.'s SOF ¶¶ 60, 62, 64.  He departed Hopkinton at the end of the 2018-2019 academic year to attend school in Quebec, Canada.  Id.  ¶¶ 65-66.

## III. RULINGS OF LAW

### A.   Legal Framework

#### 1.   Case Stated

"Case stated hearings provide an efficacious procedural alternative to cross motions for summary judgment."  Sawyer v.

United States, 76 F. Supp. 3d 353, 356 (D. Mass. 2015) (citing

Continental Grain Co. v. Puerto Rico Mar. Shipping Auth., 972

F.2d 426, 429 n.7 (1st Cir. 1992)).  In a case stated decision

"the parties waive trial and present the case to the court on

the undisputed facts in the pre-trial record.  The court is then

entitled to 'engage in a certain amount of factfinding,

including the drawing of inferences.'"  TLT Constr. Corp. v. RI,

Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007) (quoting United

Paperworkers Int'l Union Local 14 v. International Paper Co., 64

F.3d 28, 31 (1st Cir. 1995)).

### 2.    The First Amendment and Tinker

To bring a successful claim under 42 U.S.C section 1983

that their federal civil rights were violated, the Students bear

the burden of showing that Hopkinton violated the First

Amendment by proving that (1) they were engaged in

constitutionally protected conduct, (2) they were subjected to

an adverse action by the school, and (3) the protected conduct

was a substantial or motivating factor in the adverse actions.

See D.B. v. Esposito, 675 F.3d 26, 43 (1st Cir. 2012).  As the

parties do not dispute the second and third prongs –- the sole

evidence of Doe's and Bloggs's involvement is their speech –-

the students bear the burden of showing their conduct was

constitutionally-protected.

Students and teachers do not "shed their constitutional

rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Indep. Cmty Sch. Dist., 393 U.S. 503, 506 (1969); see also West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624 (1943).  Nevertheless, the "First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 260 (1988).  "The 'nature of those rights is what is appropriate for children in school.'" Bowler v. Town of Hudson, 514 F. Supp. 2d 168, 176 (D. Mass. 2007) (Saris, J.) (quoting Morse v. Frederick, 551 U.S. 393, 394 (2007)).

The Supreme Court has created several enumerated exceptions for speech that is per se unprotected: the promotion of illegal drug use, vulgarity, and school-sponsored speech.  See Morse, 551 U.S. at 393; Hazelwood, 484 U.S. 260; Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675 (1986).  "Speech falling outside of these categories is subject to Tinker's general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the right of others." Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 214 (3d Cir. 2001) (citing Chandler v. McMinnville Sch. Dist., 978 F.2d 524, 529 (9th Cir. 1992); Pyle v. South Hadley Sch. Comm., 861 F. Supp.

157, 166 (D. Mass. 1994) (Ponsor, J.)).

Tinker acknowledged the balance that must be struck between upholding fundamental constitutional protections, while "affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." 393 U.S. at 507 (citing Epperson v. State of Ark., 393 U.S. 97, 104 (1968)).  Although the Supreme Court has not delineated how far officials may limit speech that impinges the rights of other students, "'it is certainly not enough that the speech is merely offensive to some listener.'"  Bowler, 514 F. Supp. 2d at 176 (quoting Saxe, 240 F.3d at 217; citing Hazelwood, 484 U.S. at 273 n.5).  The Supreme Court has expressly said, however, that "[a] school need not tolerate student speech that is inconsistent with its 'basic educational mission.'"  Hazelwood, 484 U.S. at 266 (quoting Fraser, 478 U.S. at 685).

### 3. School Speech under Norris v. Cape Elizabeth School District

On August 6, 2020, after this Court conducted the case stated hearing, the First Circuit issued its opinion in Norris v. Cape Elizabeth Sch. Dist., 969 F.3d 12 (1st Cir. 2020), clarifying the First Amendment's Tinker standard as it applies to student speech and school discipline.

Like the current case, Norris concerned a suit by a student
who had been disciplined for bullying.  969 F.3d at 14-15.  The
student in that case, A.M., filed a request for preliminary
injunction against the school asking that the district court
enjoin her suspension.  Id.  The school sought to suspend her
for bullying because she had posted a sticky note on a bathroom
mirror with the text "THERE'S A RAPIST IN OUR SCHOOL AND YOU
KNOW WHO IT IS," and the school officials believed this
anonymous note had harmed another student, who was rumored among
their classmates to be its subject.  Id. at *14-18.  Another
session of this Court granted A.M.'s preliminary injunction, and
the First Circuit affirmed, focusing its analysis on her
likelihood of succeeding on the merits.  Id. at 22-25.  In doing
so, it resolved several issues in First Amendment jurisprudence
that are highly relevant to the current case.

The first issue is the protection afforded to non-political
speech.  The court ruled that A.M.'s note received First
Amendment protection whether it qualified as "political" or not.
Id. at 23-24.  Since her speech was protected by the First
Amendment, the court further explained that Tinker provided the
proper standard for determining if her rights had been violated.
Id. at 25 (citing Tinker, 393 U.S. 503).

Second, the court joined several other Circuits in ruling
that Tinker placed the burden on school officials to justify

restrictions on student speech.  Id. at *27 (citing B.H. ex rel.
Hawk v. Easton Area Sch. Dist., 725 F.3d 293, 321 (3d Cir. 2013)
(en banc); Bell v. Itawamba Cnty. Sch. Bd., 799 F.3d 379, 398
(5th Cir. 2015); Hardwick v. Heyward, 711 F.3d 426, 439 (4th
Cir. 2013); Trachtman v. Anker, 563 F.2d 512, 516-17 (2nd Cir.
1977)).  The court clarified that, in litigation, a school
official could not rely on post-hoc arguments, but only on their
original grounds for restricting a student's speech.  Id. at
*25-26.  In Norris those grounds were that A.M.'s sticky note
"did in fact constitute an act of bullying within [the school's]
policy."  Id. at *25.

Third, and most pertinent to the current case, the court
ruled that bullying is the type of conduct that constitutes
invasion of the rights of others under Tinker.  Id. at 29.
"Thus, schools may restrict such speech even if it does not
necessarily cause substantial disruption to the school community
more broadly."  Id.  In Norris, the First Circuit was applying
the Maine Bullying statute, which differS somewhat from the
Massachusetts statute.  Id. at 18 (citing Me. Rev. Stat. Ann.
tit. 20-A, § 6554(2)(B)).  In particular, unlike the
Massachusetts statute, the Maine Statute does not require
repeated conduct, and does not explicitly bar conduct causing
emotional harm, instead barring conduct that "interferes with
the rights of a student."  Compare id. with Mass. Gen. Laws. ch.

71, § 370.  Yet this ruling clarifies the application of the
Massachusetts law as well.

The First Circuit did not define "bullying" generically but
noted that an invasion of rights is something more than "speech
that is merely offensive to the listener."  Id. at 29 n.18
(citing Tinker 393 U.S. at 508-509; Wynar v. Douglas Cty. Sch.
Dist., 728 F.3d 1062, 1072 (9th Cir. 2013); Saxe, 240 F.3d at
217).  The court also clarified that an official is justified in
finding that student speech constituted bullying so long as
there is "a reasonable basis for the administration to have
determined both that the student speech targeted a specific
student and that it invaded that student's rights."  Id. at 29.
This standard is deferential to the school official's judgment.
Id. at 29 n.18, 30.  In reviewing officials' decisions, a court
considers the knowledge available to them at the time they
disciplined the student or implemented the speech restriction.
Id. at 31-32.  The court's review is based on the objective
reasonableness of the school's response rather than the intent
of the student.  Id. at 25 (citing Cuff v. Valley Cent. Sch.
Dist., 677 F.3d 109, 113 (2nd Cir. 2012)).

Applying this jurisprudence, the First Circuit ruled that
A.M. was likely to succeed on the merits of her case because the
school had not shown that her note caused bullying against the
other student.  Id. at 33.  School officials had discovered

18

during their investigation that rumors that the other student had engaged in sexual misconduct were already circulating widely before A.M. posted her note, including a video alleging to show him committing assault.  Id. at 31.  Students were also already aware that a complaint against him the previous academic year had resulted in a protective order.  Id.  In this context, the First Circuit ruled that the school had not met its burden of showing that A.M., who did nothing more than post a note that did not even name another student, had directly caused any bullying.  Id. at 33.  As the court explained, the school officials made "no attempt to disentangle the harm caused by the video and rumors circulated by other students.  This makes it difficult to show it was the note and not some other factors which caused any bullying."  Id. at 31.  Thus, the question of causation is crucial to analyzing whether a student is responsible for bullying.

B.   **Counts I and II: Freedom of Speech and Freedom of Assembly**

The Students charge in counts I and II that their punishment violates their freedom of speech and freedom of assembly rights under the First Amendment.  Am. Compl. ¶¶ 61-72; Bloggs Compl. ¶¶ 61-71.

They believe they were disciplined because of the contents of their messages in the Snapchat group, an unconstitutional

violation of their right to free speech.  Pls.' Mem. 4.  Their
theory is that, because the principals punished them for
bullying even though Roe did not mention them in the initial
complaint or see their messages, they were punished solely due
to their speech in the group chat, rather than for any act
directed at Roe.  Id. at 5.  The Students point to evidence that
the severity of discipline was related to their participation in
the group chat, rather than conduct directed towards Roe, in
saying they were punished for their speech rather than their
actions.  Id. at 5-6.

The Students next argue that their private speech within
the group chat was insufficient to constitute "substantial
disruption" under the Tinker standard, or to reasonably forecast
such disruption.  Id. at 8-13 (citing 393 U.S. 514).  They argue
that there was no nexus between their private comments in the
group chat and any disruption, and that Roe's "hurt feelings"
and need to transfer one class cannot constitute "substantial
disruption" as matter of law.  Id. at 9-10.  In particular, they
point to comments by Pominville in his deposition that, if the
principals had found the groups' conduct to be materially and
substantially disruptive to the educational process, they would
have written this in the report.  Id. at 9 (citing Pls.' SOF ¶¶
92-93; 97-98; 100-01); see Pominville Dep. 68:4-70:2.  They
further argue that there was no reasonable basis to forecast

future disruption in accordance with the second prong of Tinker, as "the decision to discipline must be supported by specific facts that could reasonably lead school officials to forecast disruption."  Pls.' Mem. 12 (quoting J.C. ex re R.C. v. Beverly Hills Unified Sch. Dist., 711 F. Supp. 2d 1094, 1111 (C.D. Cal. 2010)).  Finally, they argue that, as matter of law, the type of emotional harm inflicted on Roe does not qualify as interference with his rights under Tinker.  Id. at 13.

The School argues that Doe and Bloggs' comments contributed to a substantial disruption and hostile environment, and invaded Roe's rights.  Def.'s Mem. 11-20.  Viewing Doe and Bloggs' conduct as part of a collective act of bullying by the eight members of "Geoff da Man" group, the School argues that they contributed to the creation of a hostile environment for Roe at school-sponsored hockey games.  Id. at 11-12.  The School also argues that this hostile environment and collective bullying made substantial disruption reasonably foreseeable.  Id. at 9 (citing C.R. v. Eugene Sch. Dist. 4J, 835 F.3d 1142, 1151 (9th Cir. 2016)).  It further argues that Roe's discovery of the group messages was also reasonably foreseeable, and that the amount of time and effort the assistant principals spent investigating showed the actual effects of this disruption.  Id. Alternatively, the School argues that it is not required to meet the "substantial disruption" test from Tinker because it may

also prohibit speech that invades the rights of other students by causing emotional harm.  Id. at 11 (citing Tinker, 393 U.S. at 514; Morse, 551 U.S. at 407).

As an initial matter, the school officials may not rely on the "substantial disruption" prong of Tinker to justify their action.  See Norris, 969 F.3d at 25-26.  In their notices to the parents of Doe and Bloggs explaining the suspension decisions, the school officials explained that the group conduct of the students in "Geoff da Man" "caused emotional harm to the target, created a hostile environment for him during school-sponsored events and activities and infringed on his rights at school." See Pl.'s SOF, Exs. U, V, Notices of Short-Term Suspension Finding (respectively "Doe Suspension" and "Bloggs Suspension"), ECF Nos. 65-21, 65-22.  The school explained that Doe's specific contribution to the group conduct was making disparaging remarks about Roe's appearance, and that Bloggs' contribution was making disparaging comments about both Roe and his parents.  Id.[3]  Thus, these are the only grounds upon which the school may rely in this litigation.

The Students are correct that the comments by Doe and Bloggs cannot constitute bullying unless they are considered

---

[3] The School also accused Bloggs of posting a photo of Roe without his consent, but this action is properly attributed to other students.  See Doe Suspension, Snapchat Screenshots P000034-038.

part of the collective action by the eight members of "Geoff da Man." Pls.' Reply 3-4. Doe's and Bloggs' comments -- taken in isolation -- were not "directed" at Roe. The School's Bullying Policy defines bullying as speech or action "directed at a target." See Bullying Policy 2-3; Mass. Gen. Laws ch. 71, § 37O. There is no evidence in the record of any non-speech conduct by Bloggs or Doe directed at Roe, except for their failure to intervene when other students mistreated him, which is certainly insufficient alone to constitute bullying. Pls.' SOF ¶¶ 36-40. As to their speech, it was not "directed at" Roe because it was sent to a third party and there is no indication they had knowledge or intent it would go beyond that third party. See Pls.' SOF ¶¶ 77, 79, 86.

In Seney v. Morhy the Supreme Judicial Court considered the meaning of the words "aimed at a specific person" in the context of the Massachusetts civil harassment statute, Massachusetts General Laws ch. 258E, § 1. 467 Mass. 58 (2014). The Supreme Judicial Court concluded that an email sent by the defendant to a third party complaining of the plaintiff could not constitute an individual act of harassment because "at the very least, it was not directed at him and was not motivated by cruelty, hostility, or revenge." Id. at 63. Unlike the harassment statute, the Massachusetts bullying statute does not have an intent requirement, see Mass. Gen. Laws ch. 71, § 37O, but the

phrase "directed at a target" in the bullying statute is linguistically equivalent to the phrase "aimed at a specific person," Mass. Gen. Laws ch. 258E, § 1; indeed, the Supreme Judicial Court uses "directed" as a synonym for "aim" in the quoted language from Seney, 467 Mass. at 63.  Crucially, the Supreme Judicial Court ruled that the email did not become "directed" or "aimed" at a target even if it were part of an extant pattern of malicious activity.  Id. at 64.  Consequently, Doe's and Bloggs' words alone, directed entirely to a third party, cannot be said to have "targeted" Roe.  Even if Roe discovered that Doe and Bloggs had mocked him behind his back, unkind words about a target cannot constitute "bullying" under Massachusetts law absent some action to direct them at the target.  Mass. Gen. L. ch. 71, § 37O.

Of course, the Students' messages did not take place in isolation; the students in "Geoff da Man" were engaging in bullying.  A reasonable official could have found that Roe did suffer from the speech and actions of the members of the hockey team, coordinated through the Snapchat group.  This "repeated" conduct and speech "by one or more students" was "directed" at Roe, causing him "emotional . . . harm."  Mass. Gen. Laws ch. 71, § 37O.  A reasonable official could have found this bullying was "severe or pervasive."  Norris, 969 F.3d at 29 n.18.  This bullying therefore constituted an infringement of Roe's rights

and is not protected by Tinker whether or not it caused a substantial disruption.  Id. at 29.

The bullying was already taking a toll on Roe's emotional state at the time his father filed the complaint.  Roe described himself as feeling "alone" on the team and "stress about what was going on in the locker room."  Bullying Report PO000147. The members of "Geoff da Man" recognized that their actions may have been negatively impacting Roe's performance on the field, id. at PO000150-51, and Roe had to transfer out of one of his classes to avoid two of the aggressors.  Def.'s SOF ¶ 58. Though school officials would not have known it yet (and thus cannot rely on these facts in their argument), as a result of the bullying campaign, Roe declined to try out for the lacrosse team, entered mental health treatment, and ultimately left the school.  Def.'s SOF ¶¶ 58-66.

The Students argue that "the only consequences of the chat group to which the School has ever pointed are Roe's hurt feelings and the fact that he was transferred out of one of his classes," and that this is insufficient to overcome their First Amendment protections.  Pl.'s Mem. at 9-11.  They are incorrect. A reasonable official could certainly have found sufficient evidence of "emotional harm" here to invoke the Massachusetts bullying statute.  It is undisputable that bullying can have a significant emotional and social impact on victims.  See

_Kowalski_, 652 F.3d 565, 572-73.  The First Circuit is not alone

in ruling, without conducting an inquiry into the magnitude of

the disruption, that harmful speech can constitute invasion of

the rights of other students.  _C.R._, 835 F.3d at 1152-53 (ruling

that sexually harassing speech infringed the targets' rights' to

be "secure and let alone.").  As the Third Circuit has

explained:

> There is no constitutional right to be a bully . . .
> Schools are generally permitted to step in and protect
> students from abuse . . .  Students cannot hide behind
> the First Amendment to protect their 'right' to abuse
> and intimidate other students at school.  Outside the
> school context, of course, much harassment by name
> calling (understood broadly) is protected.  But the
> First Amendment does not interfere with basic school
> discipline.

_Sypniewski_ v. _Warren Hills Reg'l Bd. of Educ._, 307 F.3d 243, 264

(3d Cir. 2002).  Indeed, one of the legal responsibilities of a

school is to protect students from bullying.  _See_ United States

Department of Education, Office for Civil Rights, "Dear

Colleague" letter (Oct. 26, 2010),

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-

201010.pdf; Mass. Gen. Laws. Ch. 71 § 37H; _see also_ _Kowalski_,

652 F.3d at 572; _Lowery_ v. _Euverard_, 497 F.3d 584, 596 (6th Cir.

2007) ("School officials have an affirmative duty to not only

ameliorate the harmful effects of disruptions, but to prevent

them from happening in the first place").

     The Students' best argument is that "there is no evidence

Plaintiffs caused any harm to Roe . . ."  Pl.'s Mem. 13.  After
all, it was the other members of the Hockey Team who directly
bullied Roe, not Doe and Bloggs.  The School justifies their
discipline under the First Amendment and Massachusetts law
because, it argues, they were active contributors to the hostile
environment and infringement of rights by the hockey team.
Def.'s Mem. 9.  The school contends that, though all the
students were involved in "collectivized bullying," the
punishment of Doe and Bloggs was appropriate because it was
based on an individualized determination of their involvement.
Id. at 10.

     These theories raise a set of causality issues separate
from those in Norris.  In Norris, the First Circuit considered
the potentially-disruptive speech of a student that was not
participating in group bullying.  962 F.3d at 32–33.  Here,
instead, school officials reckoned with minimally-disruptive,
untargeted speech that was part of the group bullying.  See Doe
Suspension; Bloggs Suspension.  A.M.'s conduct in Norris may
have been a but-for cause of much of the bullying by triggering
a wide-ranging investigation, id. at 15–16, while there is no
serious argument that Doe's and Bloggs's comments are the but-
for cause of Roe's bullying.  Thus, the question is whether a
school official could attribute to them a portion of the group's
responsibility.

It is important to note initially that it does not matter whether any particular message was sent from an on- or off-campus location. Cf. Def.'s Mem. 13. If the messages by Bloggs and Doe constituted bullying at all they did so because they contributed to the in-school bullying of Roe. Different circuits have different tests for determining whether off-campus speech can be restricted by school officials, but these messages satisfy both the "nexus" test used in Kowalski, 652 F.3d at 573, and the reasonable foreseeability test used in Bell, 799 F.3d at 395-396, insofar as these tests have any meaning when analyzing messages sent from a mobile phone, see Layshock v. Hermitage Sch. Dist., 650 F.3d 205, 220-21 (3rd Cir. 2011) (Jordan, J., concurring) (en banc) ("For better or worse, wireless internet access, smart phones, tablet computers, social networking services like Facebook, and stream-of-consciousness communications via Twitter give an omnipresence to speech that makes any effort to trace First Amendment boundaries along the physical boundaries of a school campus a recipe for serious problems in our public schools."). Because much of the actual conduct and speech occurred on campus, this fact pattern is very different from the one in B.L. v. Mahanoy Area Sch. Dist., a recent case in which the Third Circuit ruled that a vulgar Snapchat message about a student's cheerleading team, when posted on her own time outside of school, was "off-campus

speech."   964 F.3d 170, 189-191 (3rd Cir. 2020).

The Students contend the theory of group action violates the First Amendment right to Freedom of Association because the School is punishing Doe and Bloggs for conduct they did not commit.   See Am. Compl. ¶¶ 70-72; Pls.' Mem. 13-14.   The Students are correct that the School cannot punish them for "mere association" with the other hockey students through Snapchat.   See Pls.' Mem. 14 (quoting Humanitarian Law Project v. U.S. Dept. of Treasury, 463 F. Supp. 2d 1049, 1070 (C.D. Ca. 2006)).   Neither may they be punished for "guilt by association."   Id. (quoting NAACP v. Claiborne Hardware Co., 458 U.S. 886, 918-19 (1982)).

These precedents do not require school officials to ignore the group context in which Doe's and Bloggs' comments were made, however, because they did not merely "associate" in the Snapchat but were active -- albeit minor -- participants in the group targeting of Roe.   The district court in Shen v. Albany upheld similar discipline against several students who did nothing more than egg on one of their peers who had created a vile Instagram page.   Case Nos. 3:17-cv-02478-JD; -02767-JD; -03418-JD; -03657-JD, 2017 WL 5890089, at *9-10 (N.D. Cal. Nov. 29, 2017).   In Shen, a student invited several of his friends to join a private Instagram page where he posted racist, derogatory, and threatening comments about other students and school personnel.

29

Id. at *2.  None of the other students submitted any posts of their own, and there was no indication in the record that the contents of the Instagram page were intended to be released beyond this group.  Id.  The privacy of the Instagram group evaporated when one of its members showed some of the posts to two of the targets at school, who quickly told others, causing an enormous outcry.  Id. at *2-3.  The judge found those posts to be a "substantial disruption" and concluded that punishment of the student who posted them was "not open to serious question."  Id. at *8.  He also found that these posts "interfered with 'the rights of other students to be secure and to be left alone,'" id. at *9 (quoting Tinker, 393 U.S. at 508), because they abrogated those students' rights to "a civil, secure, and safe school environment," id. at *10 (citing Kowalski, 652 F.3d at 573).

Relevant to the current case, the judge in Shen also upheld discipline of those students who "liked" or expressed approval of the derogatory posts.  Id. at *9-10.  The judge reasoned that these students had "meaningfully contributed" to the disruption and invasion of rights by embracing the messages, and because other students eventually witnessed their support.  Id. at *9. Crucially, the judge did not analyze whether each individual comment of "yep" or "Its too good" on the offensive posts invaded the victims' rights, but ruled that their show of

support was enough to make the students part of the enterprise.

Id. at *9-10.

Furthermore, the judge in Shen denied the school's ability to discipline those students who followed the page, or even commented, if they did not express approval of the posts directed at specific students.  Id. at *10.  This is an important distinction because the students who did not encourage the posts about individual students had done nothing more than associate with the page or express a general viewpoint, which is protected conduct under the First Amendment.  Id. at *10.

Shen is not the only case upholding discipline of students who merely encouraged bullying.  In Taylor v. Metuchen Pub. Sch. Dist., a New Jersey District Court dismissed the First Amendment claim by a parent whose elementary-school-aged child had encouraged another student to post a caricature of a third student.  Civ. A. No. 18-cv-1842, 2019 WL 1418124 at *5-6 (D. N.J. March 28, 2019).  The court reasoned that the online posting had created a substantial disruption, that the student encouraged the posting, and therefore that the student's conduct had "resulted" in a substantial and material disruption.  Id. at *6.

These cases indicate that the First Amendment does not require the contributions of each individual in a group to be "substantial" or to themselves, alone, cross the threshold of

"bullying."  A reasonable official could conclude that both Doe

and Bloggs made derogatory comments about Roe in the group

conversation.  That official could easily find that Bloggs'

comment about the "game of telephone," amidst a litany of

insults against Roe's appearance, was not innocuous.  Snapchat

Screenshots PO000036.  Doe's messages speak for themselves.  Id.

at PO000034-36.  Thus an official could find that by posting

these comments -- even if they were themselves minor relative to

the surrounding nastiness -- Doe and Bloggs had signaled their

approval and encouragement of the bullying by the other hockey

teams members.  Their punishment would not have been

constitutional under the First Amendment if they were merely

members of the Snapchat group, cf. Shen, 2017 WL 5890089, at *9-

10, but by actively encouraging the group bullying, they could

be permissibly disciplined for its results.

    This conclusion is consistent with the causality analysis

in Norris.  In Norris, "[t]he defendants do not assert that A.M.

directly participated in the bullying of Student 1 at school, or

that she was responsible for the video or any of the rumors

being circulated about Student 1."  969 F.3d at 31.  Here, Doe

and Bloggs were participants in the bullying.  This Court is

persuaded by Shen that the proper inquiry is whether the group

caused an invasion of Roe's rights and whether Doe and Bloggs

participated in the group by encouraging its behavior.  2017 WL

5890089, at *9-10.  A reasonable official could have found these facts, and these reasons align with the schools' explanations at the time.  See Doe Suspension, Bloggs Suspension.

Lastly, the Massachusetts law contemplates discipline of collective action.  Section 37O defines bullying as action "by one or more students . . . directed at a victim" that cause the listed harms.  Mass. Gen. Laws. ch. 71, § 37O.  If the isolated conduct of each student in the group had to individually meet all the elements of "bullying," the words "or more" in the statute would be read out.  Children often bully as a group. The children who stand on the sidewalk and cheer as one of their friends shakes down a smaller student for his lunch money may not be as culpable, but they are not entirely blameless. Similarly, the "Geoff Da Man" group's conduct as a whole was directed at Roe, and Massachusetts law allows School officials to consider Doe and Bloggs as members of that group.

The School has advanced the related theory that the group bullying created a "hostile environment" for Roe.  See Def.'s Mem. at 17; Bullying Report PO000152.  The concept of a "hostile environment" is a familiar one in the context of sexual harassment, but less well-defined as applied to bullying that does not involve a protected class such as race or religion. See 42 U.S.C. § 2000d.  In the context of sexual harassment, a claim of hostile environment requires, inter alia, a finding

33

that harassment was so severe and pervasive as to alter the student's educational environment.  <u>Keskinidis</u> v. <u>Univ. of Mass. Boston</u>, 76 F. Supp. 3d 254, 258 (D. Mass. 2015) (Stearns, J.) (quoting <u>Lipsett</u> v. <u>University of Puerto Rico</u>, 864 F.2d 881, 898 (1st Cir. 1988).  The Third Circuit treated the "hostile environment" theory in the context of school bullying as a type of interference with the rights of others and required a showing of both severity and pervasiveness.  <u>Saxe</u>, 240 F.3d at 217. Whether the conduct by the other members of "Geoff da Man" was so severe <u>and</u> pervasive as to create a hostile environment, the real question is one of causation -- whether Doe and Bloggs could have been punished for the group's conduct.  As this Court has already made this determination for the "emotional harm" theory, it need not conduct this separate severity and pervasiveness analysis.  It therefore declines to rule on the "hostile environment" theory.

 A reasonable official could have found Doe and Bloggs to be participants in group bullying that invaded Roe's rights.  The Court thus rules for the school on counts I and II.

> **C.  Count III: Violation of the First Amendment –**
> **Vagueness and Overbreadth**

In count III the Students challenge the School's Bullying Policy, and the Massachusetts statute defining bullying, as overbroad and vague under the First Amendment.  <u>See</u> Am. Compl.

¶¶ 73-79; Pls.' Mem. 15.  The School argues that the language of the bullying statute simply mirrors the standard set forth in Tinker.  Def.'s Mem. at 15.  The Commonwealth of Massachusetts has also weighed in as amicus to defend section 37O, arguing as well that the statute tracks and codifies the speech protections established in Tinker, and that, in particular, schools may protect students from emotional harm because such harm interferes with their right to a safe and secure school environment.  Commonwealth Amicus 10.

It is important first to define the area being challenged.  Section 37O applies to repeated speech and/or conduct "directed at a victim" that:

> (i) causes physical or emotional harm to the victim or damage to the victim's property;
> (ii) places the victim in reasonable fear of harm to himself or of damage to his property;
> (iii) creates a hostile environment at school for the victim;
> (iv) infringes on the rights of the victim at school; or
> (v) materially and substantially disrupts the education process or the orderly operation of a school.

Mass. Gen. Laws ch. 71 § 37O.  Prongs (iv) and (v) draw directly from the language of Tinker, 393 U.S. at 513.  Most of prongs (i) and (ii) concern the protection of self or property against harm, a traditional area of school responsibility.  See Morse, 551 U.S. at 424 (Alito, J.) (concurring) ("School attendance can expose students to threats to their physical safety that they

would not otherwise face.").  Prong (iii), which bars speech or conduct that creates a hostile environment, echoes language that has been upheld as constitutional in other contexts.  See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 73 (1986) (ruling that "hostile environment" sex discrimination is actionable when it is sufficiently severe and pervasive as to "alter the conditions of [the victim's] employment and create an abusive working environment.").  Of course, in the context of school speech, enforcing this prong must conform with Tinker. See Saxe, 240 F.3d at 211.

Thus, the only behavior that raises potential first amendment concerns under Section 37O possesses the following elements: (1) it is non-conduct speech (2) directed at a target (3) that causes emotional harm (4) that does not interfere, and is not reasonably likely to interfere, with the victim's rights (5) that does not cause, and is not likely to cause, a substantial disruption.

### 1.  Policy and Enacting Statute: Overbroad

The overbreadth doctrine permits litigants to challenge statutes "not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."  Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973).

Where conduct as well as speech is involved, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Id. at 615. Claimants bear the burden of establishing, "'from the text of [the law] and from actual fact,' that substantial overbreadth exists." Virginia v. Hicks, 539 U.S. 113, 122 (2003) (internal citations omitted). "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 801 (1984).

Doe and Bloggs have not shown on these facts that the Bullying Policy –- even simply the "emotional harm" section -- prohibits a substantial amount of protected conduct. They bear the burden of showing that substantial overbreadth exists. See Hicks, 539 U.S. at 122; Pls.' Opp'n 15. With that said, they have made a colorable argument that some applications of Section 37O, as written, could be unconstitutional. The Students raise the examples of political speech directed at another student that causes that student to experience emotional harm, Pls.' Opp'n 15; it is certainly conceivable that such harm could be real, but nevertheless minor enough that it does not qualify as an infringement on the student's rights or a substantial

disruption.  Norris does not entirely immunize the Massachusetts statute from review because the First Circuit, in ruling that bullying interferes with the rights of others, was applying a statute that did not contemplate emotional harm as a separate type of injury.  See 969 F.3d at 18; Me. Rev. Stat. Ann. tit. 20-A, § 6554(2)(B).

The contrasting cases of J.C. ex rel. R.C., 711 F.Supp.2d 1094, and Kowalski, 652 F.2d 565, illustrate the potential for overbreadth.  Both cases involve students who were disciplined for internet posts that bad-mouthed other students, an injury that would implicate the "emotional harm" prong of Section 37O. The major difference between the cases -- why the Fourth Circuit upheld the discipline in Kowalski, 652 F.3d at 574, and why the district court overturned the discipline in J.C. ex rel. R.C., 711 F. Supp. 2d at 1119 -- was the severity of the disruption. Under Section 37O as written, if a student engaged in identical conduct to the student in J.C. ex. Rel. R.C. but posted two YouTube videos instead of one, a school official could potentially discipline them for bullying even if their speech should be protected by Tinker.  711 F. Supp. at 1119-1122 (noting the factual record did not support a finding of foreseeable substantial disruption).

The Commonwealth argues that conduct causing emotional harm is necessarily unprotected under Tinker.  Because Section 37O

38

bars only repeated conduct, the Commonwealth argues that schools can "reasonably expect the [bullying] to escalate further if allowed to continue unchecked."  Commonwealth Amicus 11 (quoting C.R., 835 F.3d at 1152).  The Commonwealth further asserts, "in every case that rises to the level of bullying, schools can reasonably conclude that '[w]ithout intervening administrative action, the [targeted] students would be deprived of their right to be secure at school.'"  Id. (quoting C.R., 835 F.3d at 1152-53).

This argument goes too far.  Then-Judge Alito wrote in 2003 that "the precise scope of Tinker's 'interference with the rights of others' language is unclear," and the intervening years have not crystalized the definition.  Saxe, 240 F.3d at 217.  It is almost certainly not co-extensive with "emotional harm," however.  There must be some level of severity or pervasiveness.  Norris, 969 F.3d at 29 n.18.  Courts that have determined student speech infringed on the rights of other students did so only after conducting a particularized factual analysis of the severity and type of conduct.  See, e.g., C.R., 835 F.3d at 1152 (sexual harassment inherently infringes on rights of students to be secure); Wynar, 728 F.3d at 1072 (threats of physical violence infringed students' rights to be secure); Defoe v. Spiva, 625 F.3d 324, 327-29, 334-36 (6th Cir. 2010) (display of Confederate flags infringed other students'

right to be secure when school had history of racial tension).
The Third and Seventh Circuits have expressly denied that the
"rights" prong of Tinker applies to disparaging speech absent
some factual showing of rights infringement or substantial
disruption.  See Zamecnik v. Indian Prairie School Dist. # 204,
636 F.3d 874, 877 (7th Cir. 2011) (denying that a school could
discipline students for wearing shirts saying "Be Happy, Not
Gay," and noting that there is no established "'hurt feelings'
defense to a high school's violation of the First Amendment
rights of its students");  see also Sypniewski, 307 F.3d at 264-
65. ("[A] particular form of harassment or intimidation can be
regulated by defendants only if it meets the requirements of
Tinker; that is, if the speech at issue gives rise to a well-
founded fear of disruption or interference with the rights of
others).

Even so, the "emotional harm" prong in the statute is not
so substantially overbroad that it must be struck down on its
face.  The overbreadth doctrine is particularly inappropriate
when a statute encompasses a substantial amount of non-protected
conduct.  Hicks, 539 U.S. at 122-24.  Non-speech physical and
electronic conduct such as, say, taking photos of a classmate
without their consent and distributing them to one's friends,
can cause emotional harm without necessarily invoking the other
prongs of Section 37O.  As well, a great deal of "repeated"

speech "directed" at another student that "causes . . .

emotional harm" is unprotected by the First Amendment under

Tinker.  Mass. Gen. Laws ch. 71 § 37O.  Norris narrows the scope

of potential challenge further: "severe or pervasive bullying or

harassment" crosses the line into invasion of rights.  969 F.3d,

at 29 n. 18.  This indicates that repeated, directed speech

causing emotional harm, if severe or pervasive, is unprotected

by Tinker as well.  All of these factors combine to show that

the legitimate breadth of the statute is very wide.  Finding

overbreadth here is inappropriate under Hicks.

Neither is the "Cyber-bullying" portion of Section 37O

overbroad.  Cf. Pls.' Mem. 17.  The very first sentence of the

Cyber-bullying definition begins with "bullying through the use

of technology . . ." –- indicating that it merely applies to a

subset of the "bullying" defined in the preceding paragraph.

Mass. Gen. L. ch. 71 § 37O.  Thus, though the "Cyber-bullying"

section lists novel types of conduct that can constitute

bullying, a school official must show the same elements

(repetition, direction, and so on) as for offline bullying.  Id.

### 2.    Policy and Enacting Statute: Vague

The Students argue that this Court must also strike down

section 37O because it is impermissibly vague, as the term

"emotional harm" is not defined.  Pls.' Mem 19.

Courts may generally void a law for vagueness if the law

lends itself to impermissibly subjective interpretation.  See
Coates v. Cincinnati, 402 U.S. 611, 612-14 (1971) (finding
ordinance prohibiting "conduct . . . annoying to persons passing
by" impermissibly vague).  "A law is void for vagueness if
persons 'of common intelligence must necessarily guess at its
meaning and differ as to its application.'"  Caswell v.
Licensing Comm'n for Brockton, 387 Mass. 864, 873 (1983)
(quoting Smith v. Goguen, 415 U.S. 566, 572 n.8 (1974)).
Although school rules must be clear and specific enough so that
a reasonable person would understand what is prohibited and
expected, see Keyishian v. Board of Regents of Univ. of State of
N.Y., 385 U.S. 589, 604 (1967), "[g]iven the school's need to be
able to impose disciplinary sanctions for a wide range of
unanticipated conduct disruptive of the educational process, the
school disciplinary rules need not be as detailed as a criminal
code which imposes criminal sanctions."  Fraser, 478 U.S. at
686.  In the context of public schools, traditional vagueness
standards are not as rigidly applied because "maintaining
security and order in the schools requires a certain degree of
flexibility in school disciplinary procedures."  New Jersey v.
T.L.O., 469 U.S. 325, 340 (1985).

      The Students argue that the statute does not distinguish
between "emotional harm" and permissible mere "teasing," and
that using emotional harm as a standard constitutes a "heckler's

veto" because it allows punishment based on the audience's reaction.  Pls.' Opp'n 17 (citing March v. Frey, No. 2:15-CV-515-NT, 2020 WL 2044625, at *20 (D. Me. Apr. 28, 2020); Bachellar v. Maryland, 397 U.S. 564, 567 (1970)).

To address the first point, a certain level of vagueness is entirely acceptable in statutory drafting, and that the exact dividing line between legal and illegal conduct may not be immediately obvious does not make a statute vague.  See Rose v Locke, 423 U.S. 48, 49-50 (1975).  "All the Due Process Clause requires is that the law give sufficient warning . . ."  Id. at 50.  The context of the phrase "emotional harm" amidst the litany of other serious behavior banned by the statute, which includes behavior causing "physical harm," a "hostile environment," or that "infringes on the rights of others" narrows it down in context to actions that are, well, harmful. See Mass. Gen. L. ch. 71 § 37O.

Put another way, the phrase "emotional harm" is not so vague that it would fail to give a school child of common intelligence fair notice of what it means.  See U.S. v. Williams, 553 U.S. 285, 304 (2008).  By the age of five-to-seven months, infants can recognize and reflect emotions in others. Arlene S. Walker-Andrews, Emotions and Social Development: Infants' Recognition of Emotions in Others, 102 Pediatrics (Supplement E1) 1268, 1269 (Nov. 1998),

https://pediatrics.aappublications.org/content/pediatrics/102/Su

pplement_E1/1268.full.pdf.  By the age of fifteen months

children begin to develop empathy, can recognize that other

human beings experience emotions, and may attempt to comfort

them.  See Meghan MacLean Weir, Your Fifteen-Month-Old, New York

Times (April 22, 2019), https://nyti.ms/2ymCM1Y.  If toddlers

can exhibit empathy, children of school age are fully capable of

understanding that their words can cause emotional harm in

others.  A student may not be able to tell in the moment if

their "repeated" conduct "directed" at a peer is actually

causing harm, but a school-age child of common intelligence

understands that a sufficiently hard shove can be hurtful,

whether that shove is physical or emotional.

As to the second point, the Ninth Circuit has pointed out

that the "heckler's veto" doctrine is a poor fit in the context

of school speech because it is inconsistent with the

"substantial disruption" test from Tinker.  See Dariano v.

Morgan Hill Unified Sch. Dist., 767 F.3d 764, 777-78 (9th Cir.

2014).  This is because, the Ninth Circuit explains, the

"substantial disruption" test looks to the likely objective

result of the speech rather than the speaker's intent.  Id. at

778 (quoting Taylor v. Roswell Indep. Sch. Dist., 713 F.3d 25,

38, 38 n. 11 (10th Cir. 2013)).  In the context of emotional

harm, looking to whether a student has actually suffered such

harm (or a reasonable fear of harm) rather than whether the speaker intended to cause harm is fully consistent with constitutional law.  See Cuff, 677 F.3d at 113-14.

This statute also does not allow for impermissibly subjective enforcement.  In Smith v. Mount Pleasant Pub. Schs, the court found the term "verbal assault" in a statute to be vague because it allowed each school board to define the term as it saw fit.  285 F. Supp. 2d 987, 996 (E.D. Mich. 2003).  This, in turn, raised the risk of arbitrary enforcement, the court said, because the school board in that case chose a definition of "verbal assault" -- conduct "threatening the well-being, health, safety, or dignity" of students or staff -- that itself was so ill-defined as to create "unbridled discretion."  Id. at 990, 996.  Here, in contrast, discipline under this prong is limited to students who engage in (1) repeated conduct (2) directed at a target (3) that causes (4) emotional harm (or fear thereof).  Mass. Gen. Laws ch. 71 § 37O.  The requirement that all elements be present means the statute does not "invite" arbitrary enforcement.  The statute does not entirely prevent arbitrary enforcement, so the Smith court's concerns about a "thin-skinned administrator" targeting a disliked student are not entirely precluded.  285 F. Supp. 2d at 996.  Yet it is too much to ask of the statute to correct the preexisting, and lawful, power imbalance between administrator and student.

This Court therefore finds for the School on count III.  If some student in the future brings a case in which he or she is disciplined for emotionally harming a peer, when that harm is so minimal as to not invoke the exceptions in Tinker, the judicial system can address that students' claims on their own facts.

**D.   Counts IV/V: Violations of Mass. Gen. Laws, ch. 71, §**
**       82**

The Students argue that they also have a cause of action against the School for violation of Mass. Gen. Laws, ch. 71, § 82, which protects free speech in Massachusetts schools.  See Am. Compl. ¶¶ 80-84; Pls.' Mem. 20.

The statute, in relevant part, provides that "[t]he right of students to freedom of expression . . . shall not be abridged, provided that such right shall not cause any disruption or disorder within the school."  The Supreme Judicial Court has explained that "[t]he clear and unambiguous language protects the rights of the students limited only by the requirement that any expression be non-disruptive within the school."  Pyle v. School Comm., 423 Mass. 283, 286 (1996).  It further agreed with the parties in that case that the statute was "intended to codify the First Amendment protection discussed in [Tinker]."  Id.  In Westfield High Sch. L.LF.E. Club v. City of Westfield, another session of this Court read "any disruption or disorder" to include "prospective" disruption or disorder,

because a school administrator must be able to act to prevent disruption before it occurs.  249 F. Supp. 2d 98, 111 (D. Mass. 2003) (Freedman, J.).

On the current facts, Hopkinton would have been justified in finding "any disruption or disorder" resulting from the bullying of Roe.  An invasion of rights is unprotected speech, Tinker, 393 U.S. at 513, and as Section 82 codified the Tinker standard, the school's reasonable finding that the bullying of Roe constituted an invasion of his rights clears the threshold required under Massachusetts law.  Pyle, 423 Mass. at 286.  This Court therefore finds for the School on count IV/V.

## IV.  CONCLUSION

This Court recognizes that Doe and Bloggs feel their punishment is unjust.  Undoubtably, their involvement in Roe's bullying was minimal compared to the other students in the "Geoff Da Man" snapchat group.  Nevertheless, school officials have broad discretion to protect students from bullying, and if in the course of their investigations they sometimes draw in students at the periphery of the group, that does not mean they have violated those student's constitutional rights.  In this case, a reasonable official could have found the members of "Geoff da Man" had invaded Roe's rights through their collective bullying.  As members of that group, who encouraged the other members, Doe and Bloggs were appropriately subject to

discipline.

For these reasons, and because the Massachusetts bullying laws are neither so overbroad nor so vague as to require this Court to find them unconstitutional, the Student's prayer for relief is DENIED and judgment on the case stated enters for the School.  <u>See</u> ECF Nos. 64, 69.

**SO ORDERED.**

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
DISTRICT JUDGE